Okay, it looks like we're all set and the clock is set. Sarah, is there any reason we cannot proceed? No, Your Honor, and Mr. Abey is in the same office as McClatchy. That's correct. All right, thank you very much. We're now at case number 25-2023, and we'll hear from the appellant. Thank you. May it please the Court, my name is Scott McClatchy, and I represent the appellant Afachao Samey, a French citizen who is seeking the return of his minor child, a citizen of France, to France after his wife died from leukemia. This is a case about form, not custody. The Hague Convention requires that custody disputes be resolved in the country of a child's habitual residence, and on the record and under controlling Fourth Circuit and Supreme Court precedent, that country is France. I will explain today how the Court committed several errors that affected its analysis of the prima facie case, the well-settled and grave risk defenses, as well as the discretion to order the child's return. Very importantly at the outset, the Court below erred when it found that Mr. Samey had not established a date of wrongful retention. And here Mr. Samey testified at trial that October 14 and 20, 2023, he demanded the return of his child. When he was rebuffed, he then went to the French Central Authority and filed a Hague application demanding the child's return on October 27, 2023, just one week later. And Article 30 of the Hague Convention states that Hague applications shall be admissible in court. And in the alternative, at trial, Mr. Samey also introduced evidence that he sent a text message to the appellees demanding the child's return. And in that text message at trial, the appellees admitted, through the aunt, that they had received it and that they understood it to mean a demand for return and nevertheless rejected it. And the Court erred by failing to recognize either of these two wrongful retention dates. And as for the Hague application date, courts such as Babcock v. Babcock have held that that's an objective, unequivocal withdrawal of consent as a matter of law. And it was erred for the Court to just disregard those dates. And had the Court been uncertain about the dates, we actually requested the opportunity to brief them post-trial and that request was rejected. Now, once the date is set, we then have to... Wait, hold on. We didn't set a date. You gave me a series of dates and said the Court erred by not crediting one of those dates. But the problem is, to get to one of the defenses, it's not enough to say he did it at some point. I have to know when he did it. And you haven't actually told me. The District Court erred by not finding we proved it was on date X. Your Honor, what we've done is given two potential dates. We actually introduced several dates at trial. We said it was October 14 and 20, 2023, when we called. Mr. Samey called the appellees. But we also say that at the very latest, it should be October 27, 2023, which is the date the Hague application was filed demanding return of the child. That is an unequivocal withdrawal of consent as a matter of law, according to Babcock v. Babcock. And Article 30 says that that date comes in automatically through the treaty and international law. Well, it maybe comes in, but I don't know how the retention... If I just, in colloquial language, if someone has dropped off their child to stay with me for some period of time, I don't think that my retention of them becomes wrongful not just until the parent changes their mind and decides they want the child back, and not even when the parent changes their mind and tells some third party they want the child back. It seems weird for me to say that the retention is wrongful until someone tells me that the parent wants the child back. So I don't understand how filing with the French authorities does anything to tell the respondents that their retention of the child is now wrongful. I would actually take that and say that, Your Honor, that when you are filing something in court, or in this case with the central authority, saying, I no longer consent to my child being in this other country... Right, and then someone should tell the people who currently have the child that you no longer consent. Right? I mean, because if the French authorities showed up at their door, putting aside questions of international law, they would say, what are you talking about? No one has told me anything about this. And to that point, Your Honor, we would say that our client did call on two days before the week later he filed that Hague application. And what's important is... Is this the call in which he says, like, I think it's time to figure out a date for the child to come back? No, Your Honor, that's actually later. That's in December, and that's part of the text message that we mentioned in there in December 29, 2023, when he's asking for the child to return. And just because he asks, let's figure out a date, doesn't mean that he hasn't already asked and demanded the child's return. Counsel, if I could interrupt you there, I think that's fair, that later comment that, you know, might seem a little loose or unspecific doesn't mean you had not... there had not been wrongful retention before then. But it seems to me that what the district court said is that almost at every date that you propose, and as Judge Hyten said, it seems like, you know, a number of dates are kind of proposed in the alternative, which, again, nothing wrong with that, but there's counter-evidence to each date, including evidence after, you know, October, when he filed the petition with the French authorities. So, I mean, I understand the arguments, and I think there's some arguments that he can make and some facts that support it, but how, whether we're talking about October or earlier, is this something that there's not conflicting evidence that the district court's looking at and saying, look, I just see evidence on both sides here, and there's not enough to convince me that it was wrongful retention? And that's a fair question, Your Honor, and it would just go back to, you know, we contend that there was a certain date, they contend there were other dates, but at the end, the inquiry stops when our client goes and files the request in the Hague application with the French central authority, saying, I demand my child back. And that, once again, Article 30 of the Hague Convention says that that is admissible, it comes in to the court, and that is the date which others... Let's, let's, let's, I'm sorry to cut you off, but I think, yeah, let's assume you're right. Just hypothetically, that date he files, I think that's October 29th, 23. The petition is filed. Let's assume that's the date. Isn't then the next question whether, you know, whether there was a wrongful retention or where the, where the child was habitually residing before then? Yes, Your Honor. So assuming that the wrongful retention date at the latest was October 27, 2023, then the next inquiry is, was the child at home in the United States at the time? And so that's where we get into Manaski versus Tagliere. And let me, let me just clarify, because I think your brief sort of... Candidly, I think both the litigants and the district court may have mucked up the date of the well settle, of when the child was settled where. We agree that it's not the date the child went from France to the United States, because there's no allegation that was wrongful, right? Absolutely, Your Honor. The question is where the child's habitual residence was not when she first went from the United States to France, or from France to the United States. The relevant question is where she was habitually settled as of the date the removal, the retention became wrongful, right? That's right, Your Honor. And that's a great distinction because in this situation, we have a wrongful retention, not a wrongful removal. Most Hague cases from our research are wrongful removal. So they're in the one country where they're supposed to be. One parent says, I'm taking them to the United States. And as soon as they set foot in the United States and cross the border, that's when it's wrongful. It's easy to determine. This kind of a case is a little more tricky because we have potentially just like in this situation, while we say it was this day, it was this day. But the wrongful retention is as we have, just to close the loop, when he filed the Hague application. And then when we deal with habitual residents under Monaskey v. Taglieri, Justice Ginsburg explained that a child's residence in a particular country may be deemed habitual only when a residence there is more than transitory. And very importantly, she also said that the intentions of caregiving parents are relevant considerations. And the district court, in its order, found that pre-Monaskey Fourth Circuit decisions were just not useful. But according to this court's decision in Maxwell v. Maxwell, whether the parent's share is settled intention to abandon the former country of residence is a very important factor. And there are certain factors, such as whether the parents have sought employment in the new country, shipped possessions, or sought permanent immigration status, are all important and are common sense factors that this court has never abandoned. So counsel, didn't the district court make a factual finding on the intent of the mother and that there was not going to be a return to France? Yeah, again, I know that's contrary to your client's, what he said about intent. But we got the intent expressed by both parents. They seemed to diverge. And so why do we not look at that evidence? Your Honor, that's a great question. This is an unusual case. We have two different parents. And one is now no longer with us, unfortunately. But I think to turn your question just slightly on its head, the important inquiry or fact that the trial court glossed over here is that both parents and appellees expressly agreed and intended that the child would go to South Carolina temporarily while she was seeking leukemia treatment in Paris. And there is no evidence that mother wanted the child's habitual residence to be the United States. Why do you say that? I mean, it may have been, I thought one of the relatives testified that the mother said, either she's going to come to the United States when her treatment, if it was successful, ended, or they were going to go back to Africa. They weren't going to go back to France. And I mean, again, that's contrary to what your client may have thought. But I thought there was evidence that was admitted and that the district court found credible. Can I, just to follow on Judge Quattlebaum's question while you're answering, can you also address the question of whether, even if the evidence is credible, whether it's relevant, the intention of a deceased parent? So answering your question first, Your Honor, yes, the Menaski has said that the intentions of caregiving parents are relevant considerations. And that has not changed. And the Fourth Circuit has lots of precedent about this. And our understanding of the record, Judge Quattlebaum, is that the mother said that she had an intent to take the child away, to come to the United States and take her back to Africa or what have you. But that is only part of the analysis. Because here, you have no parent coming in and seeking permanent employment or residency in the United States. And the fact that you have non-parents without rights of custody trying to establish an habitual residence of this child, where they have no rights, our court here in the Rodriguez decision has affirmed that a parent cannot create a new habitual residence by wrongfully retaining a child. And so the fact that we have these non-parents trying to do so in this case should mean we believe that there is no wrongful retention or habitual residence in the wrongful retention analysis. But could I ask you to... Could you answer Judge Berner's question? I think she said, you know, do we care or is it... Care is not the right word. Is it relevant what a deceased parent's intentions may have been, you know, prior to the wrongful retention? Yes, Ron. And I think both us and my friend would agree that that is very relevant. Typically, as these cases develop, you look at that intent. And in other cases, the intent, they differ quite drastically. But in this case, both parents agreed, and the appellees agreed, that this visit was supposed to be temporary. Regardless of where she would end up eventually, it was here in the United States. Can I ask you one more question about habitual residence, and then I have a couple on grave risk. So on habitual residence, so your friend represents in their brief that they are not aware of, quote, any published decision post-Menaski that has ever reversed a trial court's habitual residence determination. Are you aware of any published decision post-Menaski that has reversed a trial court's habitual residence determination? No, I'm not, Your Honor. But I would say that it doesn't mean it can't happen, and it's only been, what, five years since that decision. So case law is catching up, and this is a perfect example where it would apply. Okay, so let's skip to grave risk. I understand the way I read the Hague Convention is that even if some defenses are made out, the Hague Convention says, essentially, the court can still say, yeah, I know that defense is made out, but I'm still going to send the child back to France. The convention contemplates the court's ability to do that. Do you know any court that has ever actually ordered the child back to the other country after finding the grave risk defense applies? Not that I can think offhand, Your Honor. And do you know any appellate court that's ever reversed a trial court for not sending the child back if the trial court correctly concluded that the grave risk defense applies? I'm not, Your Honor. Okay, so let's talk about the grave risk defense. Why is it? Look, let me posit that you make some excellent points in your brief about why a reasonable fact finder might have resolved this issue the other way. I'm less convinced that you've shown it's clearly erroneous, particularly given the... I mean, there's deference, and then there's the deference that the Supreme Court has said that we give to trial courts' credibility determinations. And the trial court finds over and over again that certain things are credible or not credible. I guess I'd like you to just take a shot at persuading me that not that it's wrong, not that it's really wrong, but that it is so wrong we can overcome the near-complete deference we give to trial courts about credibility determinations. Yes, Your Honor. And on that note, I'll note that United States v. Ali from his court says that when you have a clear and convincing evidence standard, which you need in order to prove grave risk, you have to have an abiding conviction that the ultimate determinations raised in the contentions are highly probable. And based on our review of the evidence, which in the grave risk analysis, it's calved into this 27-minute internally, we believe, inconsistent interview, excuse me, where we have constantly internally inconsistent statements suggested and leaving prompts by the interviewer. We have failure to distinguish between different actors and parties and parents and extended family members. We have omissions of adult influence, such as telling the child what to say, timeline of possibilities about when the abuse allegedly occurred. We have no sensory detail follow-up questions. We also have no corroboration from law enforcement. This court actually, in the case of Nolan v. Nolan, affirmed a district court's opinion where there were 43 different play sessions that lasted 45 minutes long each, where each time the child repetitively said, my father abused me in certain very bad ways. And despite that, the judge below found there was no grave risk because of the internally Wait, wait. So you're telling me that in a different case involving different facts, the trial court made the other finding and we affirmed it. I don't understand how that has anything to do with whether we should reverse this trial court's finding. Which is just to say, Your Honor, that in the other case, the evidence was so high in favor of grave risk. Whereas here, given the inconsistencies, given all of the stuff that we pointed out today and in our brief, it should not and does not raise to that extremely high condemnation standard, which we believe warrants the reversal in that context. In addition to the fact that Miller from this court holds that when the courts of the abducted from country are ready and willing to protect the child, there is no grave risk. And the district court expressly found in her order that the French authorities were able and capable of doing so. And yet she found grave risk anyway. And Golan from the United States Supreme Court doesn't change that analysis because all Golan says is, once you find grave risk, you don't have to fashion ameliorative measures. But it doesn't change the threshold analysis of whether grave risk exists in the first place because the child's home country can protect her during pendant custody proceedings. Okay. Counselor, your time's we've passed your time, but hold on. I want to make sure Judge Heitens and Judge Berner don't have any other questions before we move. Okay. Thank you. You have some time on rebuttal. Mr. Gary, I think we have the clock set at 20, so you should be good to go. We'll hear from you now. Thank you. You may please the court. I'm Matt Gary of Morvillo Abramowitz. We're appellate counsel for the appellees, the aunt, uncle and grandmother with whom the child has lived since June of 2022. This court should affirm the district court's exercise of discretion in refusing to uproot the child from South Carolina. The district court ruled against the appellate on three separate issues, each of which standing alone supports denial of the father's hate petition. First, the district court was correct in finding that the father failed to establish a prima facie case. The hate convention, therefore, does not even apply. Second, the district court properly exercised its discretion in finding that the child was well settled in South Carolina. And third, the district court properly exercised its discretion in declining to send the child to France in light of the grave risk of harm demonstrated by clear and convincing evidence to trial. The district court. Can I pick up on your the hate convention doesn't even apply because I have a different question related to that. So you said that your clients are the child's grandparent, aunt and uncle. Is that correct? That's correct, your honor. Have your clients ever gotten a child custody order? So we are not. My understanding is that there are child custody proceedings underway in South Carolina after this hate decision was made. So can I ask what may sound like a sort of impertinent question? Why isn't this just a straight up kidnapping? Straight up kidnapping. Yeah. So let me just understand this child has two parents. Those two parents have both legal custody over the child. Those two parents agree to send that child to South Carolina while one of them gets medical treatment. One of the parents dies. At this point, the child's only legal custodian is her father. Her father says give the child back. And the relatives don't. I don't know under what legal authority. The hate convention is the classic situation where like I'm just going to use the gender terms like mom and dad don't agree with the child should be. And one of them spirits the child back to the United States and the parents disagree. But here there's no parent on the other side. We just have a child that has a parent who says I want her to be in France. And some people who let me posit probably love the child and have been involved in the child's life. But from the perspective of the law are some random people in terms of visa. Unless you get a child custody order. These are some random people who are refusing to turn over the child to the child's father. I don't understand how this isn't an abduction or a kidnapping absent a child custody order. Well, first of all, all hate convention cases concern abductions, right? Yes, but almost all hate convention cases involve a situation in which two people both of whom have legal rights to be involved in the child's life don't agree. This case doesn't at least unless there's a child custody order. That's correct that we're dealing with a situation in which there's one biological parent. The other biological parent has died. But the facts of this case are fairly unusual. And there is testimony in the record from the end that the mother actually said to her, you know, I don't want this child to go back living with the father. I want the child to either continue. Okay, but admittedly, it's been a long time since I've taken family law. But again, with grave sympathy and respect to the fact that the mother has passed once if there are two custodial parents, one of whom dies, the wishes of the deceased custodial parent are legally irrelevant at that point. Like maybe the father should take that into account and give it very significant consideration and try to respect the late mother's wishes. But in terms of like legal power to decide where the child will be, once the parent one dies, I don't know why that person's wishes have any legal significance whatsoever. Well, I think probably this actually comes back to the elements of a pre-mutation case under the hate convention, which is, you know, that there's an alleged wrongful retention or removal. I guess I don't know the theory in which this isn't a wrongful retention. Again, let's say that the father I imagine this wouldn't work because of his economic situation but if he just went to South Carolina went to the child's school, checked her out of school and brought her back to France, I don't think your clients would have any assertion that he's done anything illegal at that moment. That's an interesting hypothetical, but the question always comes back to what is the habitual residence of the child, right? And here we have a court finding that the habitual residence of the child is in South Carolina. And so, I guess what I would say is the father's ability to exercise the custodial rights is cabined by the question of where the child's habitual residence actually is. Because the district court found that the child's habitual residence is in South Carolina rather than France... I just think that's deeply wrong too. Like, let's say that I'm a single father who is raising my child somewhere and I need to go somewhere for work and I send the child to live with their grandparents for six months and then at some point the grandparents decide they don't want to give the child back and they say, well, the child's really well settled in Wisconsin, which is where I grew up and my parents live. Like, no! I'm the child's only legal custodian. We're not getting to any of these questions. I will let this go in a minute, but it just seems deeply, deeply, deeply strange to me because I don't even understand on what legal theory your clients even claim that it was not flagrantly illegal for them to not just turn this child over to its father when he demanded it. Again, it comes back to the very limited nature of what a hate convention proceeding is, which is to determine where the child should physically be located and in custody proceedings. This is also a unique situation, right, where there are questions about whether or not the father should appropriately continue to care for this child and so that could be the subject of custody proceedings. I'm not super familiar with family law. I'm sure this is not the first time in which one parent has died, another parent is accused of abusing the child, and so other family members sort of intervene and take custody of the children. But under that theory, the district court de facto turned the hate convention proceedings into a custodial determination. I don't believe so. I think what the district court did was say that the child was not habitually resident in France at the time of the alleged wrongful retention. She did not make a determination as to custody. She made a determination as to where the child should be located. If the father then continues to be the sole custodial parent, and as Judge Heidens pointed out, the relatives that you represent are legal strangers to the child, then on what basis would your clients even be able to go into court to seek a custody determination? Frankly, I don't even know how your clients approve of medical decisions on behalf of the child or continue to enroll the child in school. As far as I understand it, they're legal strangers to the child and they would have no authority to make those kinds of determinations once consent had been withdrawn from the sole custodial parent. So those are questions of family law that are just not before the district court in making a Hague Convention determination. It's a very, very narrow claim. It's a very, very narrow case. Whether or not the aunt and uncle and grandmother are appropriately approving for medical care and things like that is not something that the district court gets into. They're just limiting their analysis to a question of where the child's habitual residence is. And if finding that the child's habitual residence is in France rather than South Carolina, whether or not certain affirmative defenses justify keeping the child in South Carolina pending whatever custody proceedings would take place in France. So let's talk about what the district court said. Why is your friend on the other side not just stone-bang right that whether it's habitual residence or well-settled, the district court fundamentally erred by talking about things that post-date the last plausible wrongful retention day. Like how the child is doing in school today. The fact that the child has a lot of friends today. The fact that it was difficult at first, but she's doing a lot better now. I mean, I bracket the point that the other side is a little shifty about when exactly the wrongful retention is. But I think we can all agree that it was at some point and it wasn't last fall. Right. I think at some point, well before last fall, it became unambiguously wrongful. And yet I see the district court talking about how she's in school today. That's just legally wrong. Isn't it? It's not legally wrong with respect to the well-settled defense for habitual residence. That question is determined at the time of the alleged wrongful retention. But when examining whether or not the child is well-settled, which is an affirmative defense, you're actually sort of asking what's going on today because the purpose of that affirmative defense is to say, okay, well somebody sort of sat on their right. They didn't file a petition within one year of the retention. And although they may in some sense be entitled because they've made out the prima facie case to have this child returned, you start to worry that uprooting the child's life will do more harm than good. So let me modify the question. You agree that to the extent I read the district court as having considered recent events for habitual residence, that was wrong? I don't read the district court's opinion that way. I said if I read it that way. If you read it that way, the district court should not consider evidence past the date of the alleged wrongful retention. Again, that kind of comes back into the problem that we have of when did that wrongful retention actually occur? But I think if you read the district court's opinion, you will see that she says even 14 or 15 months is sufficient. She cites a District of Colorado case to that effect. I think that she is in some ways targeting the late summer fall of 2023 in conducting habitual residence analysis because otherwise she wouldn't have said even 14 or 15 months. The child went to South Carolina in June of 2022 and then 14 months later we're in October 2023. So I do think that the district court appropriately cabins the habitual residence analysis to, as you put it, any plausible time that the alleged retention could have occurred. But in setting forth her findings of facts, those findings of facts can also support the well-settled defense and those can go right up until the date of the decision. And so while she did not necessarily cut that distinction in her analysis, I think it is clear from the way that she was phrasing things that she was cutting that distinction in her decision. So if you would like, I can move on to the grave risk if there aren't further questions about habitual residence or well-settled. I think the major issue that my friend faces is that the grave risk defense depends on a completely separate and independent body of factual findings made by the district court here. And the district court considered numerous sources of evidence, including the forensic interview of the child, which the appellant stipulated would serve as the child's testimony in this case. She considered testimony from the aunt who also testified that she witnessed several incidents sort of on a video call of the father physically abusing the child. So it's not as if that forensic interview is the only source of evidence for alleged abuse. She also considered the lack of credibility of the appellant himself. He categorically denied ever washing, bathing, whatever the language that it is that he ever bathed the child. And his own witness that he called in his defense said, well, actually the father bathed the child while the mother was sick. And so he completely undercut his credibility. It's very clear that that shot his credibility in the eyes of the district court. And so her factual findings in terms of the grade risk analysis is not simply just, well, I watched the forensic interview and I believe the child. That is a big component of it. But there were other factors at play, including the lack of credibility of the father and the testimony that she credited from the aunt. They really are just trying to nitpick what goes on in the forensic interview. They actually called a blind expert to testify sort of in generalities about the proper way to conduct the forensic interview. And the district court found that based on the expert testimony, she did not see anything that made the forensic interview that she observed inadequate. There is not, you know, condition of coaching. There is some confusion that is clarified in the forensic interview where the child sometimes says, oh, my mom, but she really means her aunt. And then she later clarifies and says, oh, I'm talking about my aunt here. But that's not something that's injected by the forensic interviewer. That's something that's confusion that's caused by the child herself. And I think kind of sort of gives away who she views as her caretaker here. I mean, she's so embedded in South Carolina at this point that she's calling her aunt and uncle mother and father. I think the appellant is trying to turn that on its head and make it sound like there was some kind of manipulation going on and that there was some scheme to sort of steal this child. But I think it's a reflection of the fact that after the father sent his kid to South Carolina, he didn't really engage with her anymore. He didn't provide financial support. He didn't send birthday cards or Christmas presents. And he didn't even really call her. And the judge found as a matter of fact that the father could interact with the child, could contact her if he wanted to, but he didn't. And so I think the forensic interview demonstrates all of these arguments you're making seem to more appropriately go to the custody determination rather than a hate convention determination. But on the question of brave risk, your friend points out that the district court did say that the French justice system would be adequately equipped to protect the child and to conduct a proceeding regarding these allegations of abuse. Why is it not then appropriate, given that finding, to have the French justice system determine whether or not these allegations of abuse are indeed credible? Two reasons. One is, I think if you look at Van de Sand versus Van de Sand, which is the Seventh Circuit case, they take a very pragmatic approach to grave issues of grave risk, which is upon finding that a grave risk exists of this sort of physical or sexual abuse. It's unrealistic to assume that authorities will be able to prevent it from happening again. We're talking about things that are happening behind closed doors. And so it's sort of unrealistic to say, well, the French have good laws or they take this kind of stuff seriously. And so let's just roll the dice and send the kid back and see what happens. I don't think that a district court is required upon finding that a certain country has a legal system that would protect against these kinds of things in the abstract, must therefore send the child back upon finding a grave risk. I think further, you know, Golan undercuts those arguments, although Golan doesn't address this particular sort of aspect that of whether or not a country has a system that's designed to prevent these sort of things. They do talk about ameliorative measures, which I think are conceptually very similar to the analysis of what a court has in terms of, well, does France, you know, protect against these kinds of things? It's about mitigation. It's about prevention. And in Golan, the Supreme Court says district courts are not required to consider ameliorative measures. They're not required to consider things that could be done to mitigate or prevent these types of grave risks from reoccurring. And they specifically reference, you know, physical and sexual abuse as the type of situation in which a district court can properly decline to consider those types of measures. And so I don't believe that those types of considerations necessarily mean that a district court has to send a child back to their country of origin upon finding a grave risk. And if there are no further questions, I am happy to rest on my paper. Judge Heidens, do you have any other questions? Judge Berner? Thank you, counsel. Your Honor, Matt Avey, Nelson Mullins, also here on behalf of the petitioner. Judge Heidens, let me jump to one of your questions that you had as far as the communication of the request for return to the respondent. So the judge's order on Joint Appendix 120 cites to the Guide for Judges and says that in a wrongful retention case, there are two scenarios in which the date can be determined. It's either where it is communicated to the respondent or the abductors, and in this case the respondent, make unequivocal showings that they are not going to return the child. And there is nothing that requires a date certain for those actions, but it is an either or. And so in this case, we have both scenarios. We have both the fact that he communicated on the 14th and the 20th of 2023, but then we also have the admission of... Just to be clear, the 14th and 20th, these are the October calls? Correct. Those are the phone calls from the... For which, just be clear, for which literally all we have is your client's own unadorned testimony that that happened and no corroborating evidence whatsoever? That is correct, Your Honor. And doesn't the district judge say, like, it's kind of weird that dad says he made these phone calls, but there's literally no evidence of them at all? I agree with you. And how could a district judge clearly err in saying, I'm not with all respect going to take your client's uncorroborated word for when he did this? I certainly understand your point, but our fallback to that is, Your Honor, that even if you don't trust those dates, you don't trust the 14th and the 20th, you have the 27th. And that date is set. And again, it's an either or. So it doesn't have to necessarily be the communication. It can also be the unequivocal respondent's not willing to return. So, counsel, if I could stop you, let's go with what you just said that the October 27th date, let's assume that's a date that the retention becomes wrongful. Do we then look to the period before that to determine the habitual residence of the child? Is that the next legal step we do? That is correct. And it was error for the trial court to consider anything after. And the trial court very clearly did by considering the school records, the English proficiency at the time of trial, the fact that the child had friends at the time of trial. So let me, before I get to that, address the good question Judge Heitens and Judge Berner mentioned about whether the grandmother and aunt would have had any sort of custodial rights. Under the hate convention law, tell me if this is correct or incorrect. They may or may not have custodial rights being that one parent has died and one survives. But under the hate convention, if the wrongful retention is October 27th, that means that the father had not established that it was wrongful for the child to be there before then. And we would look to whether the district court was right in deciding whether the child was habitually residing there prior to October 27th. In other words, I guess I'm asking this. Could the child be habitually residing in South Carolina prior to October 27th with two relatives who were not parents? No, Your Honor. I'm saying it's a matter of law because what you said right before I asked you was that the district court looked at evidence after October 27th. That's one thing. It seems to be now you're saying there's no way whatsoever that two relatives that the father had at some point agreed for these to be keeping the child. It's no way that there's no way as a matter of law that the child could have habitually resided there. Is that what you're saying? Under these facts, correct, and under the Fourth Circuit, this court's precedent in Rodriguez What are those facts? Tell me what those facts are. The facts are here that the child came to the United States with the consent for a transitory period and then after that was asked to be returned. The fact that it's a transitory period even under Monaskey means that you do not create the new provincial residence. Is there a period? That makes sense to me, certainly the way this started out, but it continued for at least over a year until October 27th. I know your client disagrees and said he checked in and tried to get the child sent back before but the district court looked at evidence that found that uncredible. I guess I'm trying to figure out what might have been an initial transitory period kind of progress into something that's not and becomes habitual residence. Is that like impossible as a matter of law? No, your honor, it's not impossible as a matter of law. However, that's not the facts of the case here. Everybody agrees that the child was intended to return once mother's treatment and even the respondents agree to that. Now there is some evidence in the record where the respondents claim that the mother called and said that she wanted to take the child back to Africa, didn't want to take the child back to France, but that doesn't mean that South Carolina becomes the child's habitual residence. And so under these facts and under the principle in Rodriguez from this court, that you cannot create a new habitual residence by wrongfully retaining the child, that means that the habitual residence is France. And that's, if I can sum up this point, just the overarching point of this case, which is the hate convention's purposes would be advanced by returning this child to France. The hate convention itself is founded on principles of internation trust and on comedy. And the other countries have to trust that the United States, even in the tough cases, is going to enforce the return remedy where it needs to enforce it. And this is one such case where the district court has erred as a matter of law, both in finding that France was not the child's habitual residence and in refusing, after finding of grave risk, which we believe rests on shaky grounds, in refusing to consider ameliorative measures that were properly presented to the district court and just not even addressed in the district court's opinion. So as a result of that, we'd ask that the court reverse interjudgment for the petitioner and remand for a decision on the prompt return or the logistics of the prompt return of the child to France. Thank you, counsel. Judge Heitens, Judge Berner, do you all have any other questions? We appreciate both of y'all's arguments in this difficult case and helping us to address this issue. Normally, I forgot to say this to the first lawyers, but one of the traditions of our court is that we come down and greet y'all in person. We obviously can't do that physically, but please accept our thanks for presenting these arguments to us and helping us decide this case. Thank you, your honors. Okay, Judge Heitens, Judge Berner, do you want to take the next case or would y'all like to take a break? Could we take five? Sure, sure. Sarah, if we'll take a five-minute break and we'll come back and then go to the next case.
judges: A. Marvin Quattlebaum Jr., Toby J. Heytens, Nicole G. Berner